**26**
**RAINES FELDMAN LITTRELL LLP**
Robert S. Marticello (State Bar No. 244256)
rmarticello@raineslaw.com
4675 MacArthur Court, Suite 1550
Newport Beach, CA 92660
Telephone:  (310) 440-4100 / Facsimile:  (310) 691-1943

Mark S. Melickian (IL SBN 6229843)
(*Admitted Pro Hac Vice*)
mmelickian@raineslaw.com
30 North LaSalle Street, Suite 3100
Chicago, IL 60602
Telephone: (312) 704-9400

*[Proposed] Counsel for the Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF CALIFORNIA**
**FRESNO DIVISION**

| | |
|---|---|
| In re:<br><br>HRONIS, INC., a California corporation, *et al.,*[1]<br><br>Debtors. | Case No. 1:26-bk-10978 (Lead Case)<br><br>Adversary Case No.<br><br>Jointly Administered with Case Nos. 1:26-bk-10979, 1:26-bk-10980, 1:26-bk-10981, 1:26-bk-10982, 1:26-bk-10983, 1:26-bk-10984, 1:26-bk-10986, 1:26-bk-10987, and 1:26-bk-10988 |
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF HRONIS, INC. AND ITS AFFILIATED DEBTORS,<br><br>Plaintiff,<br><br>vs.<br><br>CONTERRA AGRICULTURAL CAPITAL, LLC,<br><br>Defendant. | **COMPLAINT FOR:**<br><br>**1. EQUITABLE SUBORDINATION;**<br><br>**2. DECLARATORY JUDGMENT REGARDING PERSONAL PROPERTY;**<br><br>**3. AVOIDANCE OF PREFERENTIAL TRANSFER;**<br><br>**4. DECLARATORY JUDGMENT REGARDING CREDIT BID;** |

[1]    The Debtors in these chapter 11 cases, along with the last four (4) digits of their federal tax identification numbers, are:  (1) Hronis, Inc., a California corporation (5867); (2) Hronis Capital Assets, LP, a California limited partnership (9998); (3) Hronis Capital Management, LLC, a California limited liability company (0914); (4) Hronis Citrus, LLC, a California limited liability company (0635); (5) Hronis Farming, LP, a California limited partnership (7977); (6) Hronis Fruit Company LLC, a California limited liability company (1405); (7) Hronis Land Company, a California general partnership (1636); (8) Hronis Ranch, LLC, a California limited liability company (4214); (9) Hronis Resource Management, LLC, a California limited liability company (3455); and (10) The Hronis Family Limited Partnership, a California limited partnership (9738).

1

5. **DECLARATORY JUDGMENT REGARDING COMMERCIAL TORT CLAIMS;**

6. **DECLARATORY JUDGMENT REGARDING POSTPETITION PROCEEDS BASED ON EQUITIES OF THE CASE; AND**

7. **OBJECTION TO CLAIM**

The Official Committee of Unsecured Creditors (the "**Committee**") of Hronis, Inc., and its affiliated debtors (collectively, the "**Debtors**"), in the above-captioned jointly administered chapter 11 cases (collectively, the "**Cases**"), by and through its proposed undersigned counsel, hereby files, in its own right and/or on behalf of the Debtors' estates (collectively, the "**Estates**"), this adversary proceeding complaint (the "**Complaint**") against Conterra Agricultural Capital, LLC ("**Conterra**"), and alleges as follows:

## NATURE OF THE ACTION

1. By this adversary proceeding, the Committee seeks: (i) equitable subordination of Conterra's secured claim(s) to the claims of the general unsecured creditors of the Estates and the transfer of any lien(s) securing such subordinated claim(s) to the Estates pursuant to 11 U.S.C. § 510(c); (ii) declaratory judgment that the personal property of Hronis Ranch, LLC, and Hronis Resource Management, LLC, are not subject to any enforceable security interests or liens asserted by Conterra and, alternatively, are avoidable under 11 U.S.C. §§ 544, 550, and 551; (iii) the avoidance of preferential transfers with respect to Hronis Fruit Company, LLC, and Hronis Resource Management, LLC, under 11 U.S.C. §§ 547, 550, and 551; (iv) declaratory judgment that Conterra is not entitled to credit bid its asserted secured claim(s) for cause under 11 U.S.C. § 363(k); (v) declaratory judgment that commercial tort claims of the Estates are not subject to any security interests or liens asserted by Conterra; (vi) declaratory judgment that the purported security interests of Conterra in the Debtors' prepetition property do not extend to proceeds, profits, offspring, or products thereof based on the equities of the case pursuant to 11 U.S.C. § 552(b); and (vii) an order disallowing Conterra's claim(s) in the Cases under 11 U.S.C. § 502(d).

2. Prepetition, Conterra exercised control over the Debtors and their operations, including by dictating which trade creditors would and would not be paid on week-to-week basis. Conterra wielded its control to the detriment of the Debtors' general unsecured creditors. Among other inequitable conduct, Conterra, through its control of the Debtors, strung along the Debtors' trade creditors, inducing them to provide necessary value-creating services, products, and inventory for Conterra's benefit while the Debtors' outstanding debts to those creditors grew larger and larger or remained unpaid. As the year progressed, the payments Conterra permitted to trade creditors decreased. Then, once a particular creditor was no longer useful or beneficial to Conterra or its collateral, payments to such creditor were cut off completely. Conterra should not be permitted to reap the value the general unsecured creditors were instrumental in creating (and were induced to create) without paying the debts such creditors incurred in creating it.

3. The Debtors' trade creditors were left with significant balances owing—balances that increased during the period of time that Conterra controlled the Debtors and due to that control. Conterra's inequitable conduct served to unfairly improve its recovery at the direct expense of the Debtors' trade creditors.

4. In addition to the foregoing, Conterra has asserted liens that were not granted to it, that were perfected during the preference period, or that were not perfected at all. The Committee seeks to challenge or avoid such liens in the subject property and the proceeds thereof, including the farm products and other personal property of Hronis Ranch, LLC, and Hronis Resource Management, LLC, and the Debtors' commercial tort claims. The Committee seeks a judgment that such liens are not enforceable or are avoidable, thereby creating value for the benefit of the general unsecured creditors.

### JURISDICTION, VENUE AND STATUTORY PREDICATES

5. This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

3

6. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and General Order No. 161,[2] dated July 10, 1984, from the United States District Court for the Eastern District of California.

7. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b).

8. Venue of this adversary proceeding is proper in this district pursuant to 28 U.S.C. § 1409(a).

9. The statutory predicates for the relief sought herein are sections 105, 363, 502, 510, 544(a), 547, 550(a), and 551, 552, of title 11 of the United States Code (the "**Bankruptcy Code**"), and 28 U.S.C. §§ 2201, 2202.

## THE PARTIES

10. Plaintiff is the Committee appointed in the Cases by the United States Trustee for Region 17 (the "**U.S. Trustee**") pursuant to section 1102(a) of the Bankruptcy Code. As set forth in the *Amended Appointment of Official Committee of Unsecured Creditors* dated April 30, 2026 [ECF 268],[3] the Committee is comprised of the following six members: Buttonwillow Warehouse Company, Inc., Batth Brothers Farm, Robinhood Logistics, Inc., Nutrien Ag Solutions, Inc., LMG Logistics, LLC, and Bloom Fresh International Limited.

11. Defendant Conterra is an Iowa limited liability company having its principal place of business at 5465 Mills Civic Parkway, Suite 201, West Des Moines, Iowa 50266.

12. The Debtors consist of ten entities that filed voluntary petitions for relief under chapter 11 the Bankruptcy Code on March 6, 2026: Hronis, Inc. ("**Hronis**"), a California corporation; Hronis Capital Assets, LP ("**HCA**"), a California limited partnership; Hronis Capital Management, LLC ("**HCM**"), a California limited liability company; Hronis Citrus, LLC ("**Hronis Citrus**"), a California limited liability company; Hronis Farming, LP ("**Hronis Farming**"), a California limited partnership; Hronis Fruit Company LLC ("**Hronis Fruit**"), a California limited liability company; Hronis Land Company ("**Hronis Land**"), a California

---

[2] General Order No. 161 is captioned "The Reference of Bankruptcy Cases After July 10, 1984."

[3] Citations to "ECF ___" herein refer to the corresponding entry number on the docket of *In re Hronis, Inc.*, Case No. 26-10978.

general partnership; Hronis Ranch, LLC (**"Hronis Ranch"**), a California limited liability company; Hronis Resource Management, LLC (**"HRM"**), a California limited liability company; and The Hronis Family Limited Partnership (**"Hronis Family LP"**), a California limited partnership.

13. HCA is the owner of 1,042 acres of farmland.

14. Hronis Citrus is the owner of a citrus packhouse.

15. Before the commencement of the Cases, Hronis Fruit was used as a procurement outlet for outside growers.

16. Hronis Land is the owner of 800 acres of farmland and a 164,000 square foot cold storage facility.

17. Hronis Ranch is the owner of 999 acres of farmland.

18. HRM is the employer of record for year-round personnel.

19. Hronis Family LP is the owner of 767 acres of farmland and a 19.54-acre shop/boxyard.

20. The principal place of each Debtor is 10443 Hronis Road, Delano, California 93215.

<strong><u>PROCEDURAL HISTORY</u></strong>

**A.** **<u>General Background</u>**

21. On March 6, 2026 (the **"Petition Date"**), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Eastern District of California (the **"Court"**).

22. Since the Petition Date, the Debtors have been managing and operating their businesses as debtors-in-possession.

23. By Order of the Court entered on March 13, 2026, the Debtors' bankruptcy cases are being jointly administered for procedural purposes with Hronis's bankruptcy case as the lead case [ECF 85].

24. On March 20, 2026, the U.S. Trustee appointed seven members to the Committee [ECF 103]. The composition of the Committee was later amended by the U.S. Trustee on April 30, 2026 [ECF 268], amending the number of members from seven to six.

25. To date, no chapter 11 plan has been filed in the Cases.

**B.**      **The Debtors' Motion for Postpetition Financing**

26. On March 9, 2026, the Debtors filed their motion to incur senior secured post-petition financing from Conterra, among other relief (the "**DIP Motion**") [ECF 38].

27. Prior to the Committee's formation, the DIP Motion was granted on an interim basis by the Court on March 12, 2026 (the "**Interim DIP Order**") [ECF 79].

28. On March 31, 2026, the Committee filed an objection to the DIP Motion [ECF 157].

29. On April 7, 2026, the Court conducted a hearing to consider the DIP Motion on a final basis and heard argument from the Debtors, Conterra, and the Committee. The Court approved the DIP Motion and the Court entered a final order granting the DIP Motion on April 24, 2026 (the "**Final DIP Order**") [ECF 258].

30. The Interim DIP Order and Final DIP Order contain robust stipulations and acknowledgements by the Debtors with respect to the validity, priority, and extent of Conterra's prepetition liens and indebtedness (the "**Debtors' Stipulations**").

31. The Final Order provides that, as of March 12, 2026, the Debtors' Stipulations became valid and binding on the Debtors, the DIP Lender, all other creditors of the Debtors and all other parties-in-interest.

32. The Debtors' Stipulations are subject to the Committee's right to commence a "Challenge" (as defined in the Final DIP Order). (*See* Final DIP Order at ¶ H.) Also subject to the Committee's Challenge is the Debtors' payment of any "Prepetition Cash Collateral" to Conterra on account of its "Prepetition Secured Obligations." (*See* Final DIP Order at ¶ 20.o). A Challenge includes, among other things, a motion, objection, complaint:

> (a) objecting to or challenging the amount, validity, perfection, enforceability, priority, or extent of the Prepetition Secured Obligations or the Prepetition Liens or (b) seeking to limit or deny

the DIP Lender's right to credit bid for cause pursuant to 11 U.S.C. § 363(k), or (c) asserting any Avoidance Action or any other claims, counterclaims or causes of action, objections, contests, rights under the Bankruptcy Code, or defenses against the DIP Lender or its subsidiaries, affiliates, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof in connection with or related to the Prepetition Loan Documents, the Prepetition Secured Obligations, the Prepetition Liens, or the Prepetition Collateral.

(*See* Final DIP Order ¶ 20(d)(iii) and footnote 5.)

33. The Final DIP Order established May 18, 2026 at 11:59 p.m. (prevailing Pacific Time) as the deadline for the Committee to commence any Challenge (the "**Challenge Deadline**").

### C.     <u>The Debtors' Proposed Sale of Substantially All Assets</u>

34. On March 20, 2026, the Debtors filed their motion to approve proposed bid procedures and other related relief (the "**Bid Procedures Motion**") [ECF 104]. The Committee filed an objection to the Bid Procedures Motion on March 31, 2026 [ECF 159]. The Court entered an order approving the Bid Procedures Motion on April 24, 2026 [ECF 253].

35. On May 5, 2026, the Debtors filed a motion for the approval of a sale of substantially all of the Debtors' assets free and clear of liens, claims, interests, and encumbrances (the "**Sale Motion**") [ECF 278]. The Debtors have identified Conterra as the stalking horse bidder for the assets at a $110 million purchase price, plus the outstanding amount borrowed by the Debtors under the DIP Facility (as defined in the Sale Motion), and the assumption of certain liabilities. (*See* Sale Mot. at 4.) The deadline to file objection to the Sale Motion is May 19, 2026.

### FACTUAL BACKGROUND

### A.     <u>The Debtors' Business</u>

36. The Debtors are a family-owned business, with the principal shareholders as of the Petition date being Kosta Hronis and Peter Hronis.

37. The Debtors collectively comprise a single business enterprise that has farmed in the San Joaquin Valley for more than 80 years, growing, harvesting, and marketing table grapes, citrus, and most recently, pistachios.

38. Upon information and belief, the Debtors' farmland consists of 26 non-contiguous ranches covering approximately 3,700 acres located within the California Counties of Kern and Tulare.

39. Upon information and belief, the Debtors have historically harvested most of the fruit they sell from approximately 6,000 acres of farmland that is either owned or leased by one or more of the Debtors. Upon further information and belief, the Debtors have historically harvested approximately between 10% and 20% of their fruit from other farmers' acres under purported contract.

40. Upon information and belief, Hronis is considered a vertically integrated producer. According to the *Omnibus Declaration of Allen Soong in Support of First Day Motions* (the "**First Day Declaration**") [ECF 41], the Debtors cultivate "permanent vines of several varieties that yield fruit at different times during the summer and autumn months (typically July through November). . . ." (*See* First Day Decl. at ¶ 13.) The Debtors harvest and pack the grapes into boxes, store the packed boxes in cold storage for up to 45 days, and then sell and ship "those boxes of grapes to third party customers who, in turn, sell them to customers." (*See id.*)

41. Upon information and belief, the grapes that the Debtors sell has historically included grapes bought from third-party producers in order to fulfill demand from the Debtors' customers.

42. Upon information and belief, the Debtors employ approximately 30 employees and 20 contractors on a year-round basis, and have historically required approximately 2,500 laborers to harvest, pack, and ship fruit during the harvest peak season.

43. Upon information and belief, the Debtors' customer base includes regional retailers and supermarket chains, such as Walmart, Costco, and Del Monte.

**B.     The Term Loan Agreement With AgAmerica**

44.     Prior to the Petition Date, Hronis Ranch, Hronis Family LP, Hronis Land, Hronis Citrus, and HCA, as borrowers, entered into that certain Term Loan Agreement (the "**Term Loan**"), dated as of December 29, 2023, with AgAmerica Lending LLC ("**AgAmerica**"), a Florida limited liability company, as lender. Kosta Hronis and Peter Hronis were also borrowers on the Term Loan.

45.     The Term Loan provided for an aggregate principal amount of $70 million made through two loans.

46.     To secure the repayment of the indebtedness, Hronis Ranch, Hronis Family LP, Hronis Land, Hronis Citrus, and HCA executed (i) that certain Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing with respect to real property in Kern County, California and (ii) that certain Deed of Trust, Security Agreement, Assignment of Rents, and Fixture Filing with respect to real property in Tulare County, California (collectively, the "**AgAmerica Deeds of Trust**").

47.     Upon information and belief, AgAmerica assigned all its rights under the Term Loan, along with the related notes and the AgAmerica Deeds of Trust to Ag REIT Two, LLC.

**C.     The Loan and Security Agreement with Conterra**

48.     Prior to the Petition Date, certain Debtors, as borrowers, entered into that certain Loan and Security Agreement (the "**LSA**"), dated as of October 29, 2024, with Conterra, as lender, that provided a revolving line of credit with a maximum draw amount of up to $55 million (the "**Line of Credit**").

49.     Prior to the Petition Date and in connection with the LSA, a Promissory Note, dated October 29, 2024, was executed in favor of Conterra in the amount of $55 million (the "**Conterra Promissory Note**").

50.     The LSA is guaranteed by Kosta James Hronis, Peter John Hronis, Demetrius Albert Hronis, The Kosta Hronis Living Trust Dated February 12, 2014, The Peter John Hronis Living Trust Dated February 28, 2006, and by Kosta Hronis and Peter J. Hronis, Trustees of the Sophia Hronis Irrevocable Trust One Dated December 27, 2012.

51. To secure the repayment of the indebtedness under the Conterra Promissory Note, the "Borrowers" purportedly granted certain security interests to Conterra under the LSA. Section 5.1 of the LSA, purportedly grants Conterra a security interest in substantially all personal property of the "Borrowers" (as defined in Section 1.1 of the LSA). Specifically, section 5.1 of the LSA reads, in part:

> To secure the payment and performance of the Liabilities, Borrower hereby grants to the Lender a continuing security interest in and to the following property and interest in property of Borrower, whether now owned or existing or hereafter acquired or arising and wheresoever located:
>
> All Borrower's Accounts, Inventory, Equipment, Farm Products, Fixtures, Goods, General Intangibles, Payment Intangibles, Commercial Tort Claims, Deposit Accounts, Commodity Accounts, Commodity Contracts, Investment Property, Instruments, Letters of Credit Rights, Documents, Chattel Paper, Electronic Chattel Paper, Tangible Chattel Paper, all accessions to, substitutions for, and all replacements, products, proceeds, and proceeds of proceeds of the foregoing (including, without limitation, proceeds of insurance policies insuring any of the foregoing and any other kind of proceeds coming from Borrower's crop), all rights under and payments due or to become due under any federal or state laws, rules, regulations, or programs pertaining to any of the foregoing, all books and records pertaining to any of the foregoing (including, without limitation, customer lists, credit files, computer programs, printouts and other computer materials and records), and all insurance policies insuring any of the foregoing. The Collateral includes all Real Property Collateral and all fixtures on Real Property Collateral.
>
> All of the Real Property Collateral, together with all licenses and permits [sic]
>
> Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, crops, timber, all diversion payments or third party payments made to crop producers, all water and riparian rights, wells, ditches, reservoirs and water stock and all existing and future Improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the Real Property Collateral.
>
> All water and water rights and water shares, whether surface or underground, tributary, non-tributary, not non-tributary, wells, well permits, ditches, ditch rights, reservoir and storage rights, water district taps, accounts and allocations appurtenant to and used in connection with the Real Property Collateral.
>
> Together with all substitutions and replacements for and products of any of the foregoing property and together with proceeds of all of the foregoing property and, in the case of all tangible Collateral,

> together with all accessions and together with all accessories, attachments, parts, equipment and repairs now or hereinafter attached or affixed to or used in connection with any such goods [sic]

52. Under section 1.1 of the LSA, "farm products" means "all personal property of Borrower used or for use in farming operations, now or hereafter owned by Borrower or now or hereafter purchased by or for the benefit of Borrower. Farm Products shall also include, but shall not be limited to, any other 'Farm Products' as that term is used or defined in the Code." The "Code" means the California Commercial Code.

53. Under section 9102(a)(34) of the California Commercial Code, the definition of "[f]arm products" includes crops grown, growing, or to be grown on trees, vines, and bushes. Section 9102(a)(44) of the California Commercial Code defines "goods" to include, among other things, "things that are movable when a security interest attaches" such as "crops grown, growing, or to be grown, even if the crops are produced on trees, vines, or bushes." Thus, farm products and growing crops are personal property as are any proceeds from such property.

54. Section 1.1 of the LSA defines the term "Borrower" to mean only HCA, HCM, Hronis Citrus, Hronis Farming, Hronis Fruit, Hronis, Hronis Land, and Hronis Family LP.

55. Hronis Ranch and HRM are excluded from the definition of "Borrower" as used in the LSA and, therefore, did not grant Conterra a lien in their respective personal property, which would include any farm products or growing crops.

56. A UCC-1 Financing Statement, bearing file number U240083964841, was filed on October 29, 2024, with California's Office of the Secretary of State, identifying Conterra as the secured party (the "**Conterra UCC-1**"). The description of the collateral on the Conterra UCC-1 states: "All Assets." The "debtors" identified on the Conterra UCC-1 include HCA, HCM, Hronis Citrus, Hronis Farming, Hronis, Hronis Land, Hronis Ranch, and Hronis Family LP. The Conterra UCC-1 wrongly includes Hronis Ranch as a debtor.

57. To further secure the repayment of the indebtedness under the Conterra Promissory Note, Hronis Ranch, Hronis Family LP, Hronis Land, Hronis Citrus, and HCA

11

executed that certain Deed of Trust, Security Agreement, Assignment of Rents, and Fixture Filing, dated October 29, 2024, with respect to real property in Kern County, California and Tulare County, California (the "**Conterra Deed of Trust**").

58. The Conterra Deed of Trust was recorded with the Tulare County Recorder on November 5, 2024 as Document No. 2024-0056030. The Conterra Deed of Trust was recorded with the Kern County Recorder on November 7, 2024 as Document No. 224138621.

59. Pursuant to an Intercreditor Agreement by and between Ag REIT Two, LLC and Conterra, made as of October 29, 2024, the Conterra Deed of Trust is junior in priority to the AgAmerica Deeds of Trust.

**D.      Conterra Increases the Line of Credit**

60. As 2025 progressed, Conterra increased its indebtedness to the Debtors and tightened its grip on the Debtors.

61. The Debtors and Conterra entered into two letter agreements, an April 9, 2025 letter agreement (the "**April 9 Letter Agreement**"), and a June 27, 2025 letter agreement (the "**June 27 Letter Agreement**" and together with the April 9 Letter Agreement, the "**Letter Agreements**").

62. The April 9 Letter Agreement established the terms by which Conterra agreed to provide a limited one-time waiver for an additional draw of funds in the amount up to $6 million under the LSA and Conterra Promissory Note, and as consideration for, and as a condition for, the availability of the additional funds, Conterra was granted additional security interests by the Debtors.

63. The additional security interests described in the April 9 Letter Agreement consisted of: (i) a second lien on the Cessna CJ3 owned by Shamrock Transportation, LLC (the "**Cessna**"); (ii) a second lien on real property located at 100 S Orange Grove Blvd #201, Pasadena, California; (iii) a second lien on real property located at 35511 Camino Capistrano, Dana Point, California; (iv) a lien on all horses owned by Hronis Racing, LLC or in which Hronis Racing, LLC (or any affiliate of Hronis Racing, LLC, the borrowers or guarantors

identified in the April 9 Letter Agreement) has an ownership or partnership interest therein; and (v) a pledge of the membership interests of Hronis Racing, LLC.

64.     The April 9 Letter Agreement also obligated the Debtors to provide Conterra with weekly status updates (i) showing the Debtors "continuing to perform in the ordinary course of business consistent with [the Debtors'] business plan(s) and weekly cashflows, as provided to and approved by [Conterra] prior to this Letter Agreement" and (ii) showing the Debtors' "capital/debt/equity raising efforts."

65.     The June 27 Letter Agreement established the terms by which Conterra agreed to provide a limited one-time waiver for additional draws in the amount up to $85.85 million, and as consideration for the availability of the additional funds, Conterra was paid $850,000 (which was made by increasing the principal balance of the Conterra Promissory Note).

66.     In addition to a credit line increase, however, the June 27 Letter Agreement set forth requirements that solidified Conterra's control of the Debtors and their operations. Unlike the April 9 Letter Agreement, which required mere passive weekly reporting, the restrictions in the June 27 Letter Agreement were extensive and enabled Conterra to obtain and exercise control of the Debtors and their operations.

67.     Pursuant to the June 27 Letter Agreement, the Debtors were required to retain a Chief Restructuring Officer ("**CRO**"). The CRO had to be acceptable to Conterra in its sole discretion. The June 27 Letter Agreement thus provided Conterra with the final say and managerial control over the selection of the officer placed at the center of the Debtors' operations. The CRO's engagement was to continue until Conterra was paid in full (or Conterra and Debtors agreed that the CRO was no longer required). In the June 27 Letter Agreement, the Debtors pre-approved the CRO to act as a receiver for Conterra. Concurrent with the execution of the June 27 Letter Agreement, Paladin Management Group ("**Paladin**") was designated as CRO for the Debtors. Upon information and belief, Allen Soong and Scott Avila, both of whom are Partners at Paladin, have been the two primary individuals at Paladin performing the CRO duties, as co-CROs, for the Debtors.

68.    The June 27 Letter Agreement required the Debtors to liquidate if Conterra's debt was not paid by February 28, 2026.

69.    The June 27 Letter Agreement set forth the rights and responsibilities of the CRO selected by Conterra, including, but not limited to, (i) complete and unfettered access to the books and accounting records of the Debtors and non-debtor Grapeco Farm Management, Inc., (ii) ensuring the Debtors' compliance with the deposit account control agreement in Conterra's favor, (iii) full and final power and authority to sell some or all of the Debtors' assets in transactions outside the ordinary course of business, (iv) selling the Cessna (a non-debtor asset for Conterra's benefit), and (v) having full and sole responsibility for the borrowing of funds by the Debtors under the LSA and the Letter Agreements.

70.    The CRO's duties included the "authorization" to disclose and discuss with Conterra *all matters* that it inquired upon, as well as the preparation of reports requested by Conterra.  Thus, the CRO selected by Conterra reported directly to it, and Conterra contracted for unfettered access to the Debtors' information.

**E.    Conterra Acquires the Term Loan**

71.    Upon information and belief, on or about February 6, 2026, Conterra acquired the Term Loan, the related notes and the AgAmerica Deeds of Trust from Ag REIT Two, LLC, resulting in Conterra holding the overwhelming portion of the secured debt asserted against the Debtors as of the Petition Date.

**F.    Conterra's Influential Role as the Debtors' Financial Condition Worsened Leading Up to Bankruptcy**

72.    As the Debtors' financial woes continued and worsened, Conterra became increasingly proactive in the control and direction of the Debtors' affairs.  This was especially so after the execution of the June 27 Letter Agreement.

73.    The June 27 Letter Agreement enabled Conterra to exercise *de facto* control of the Debtors through the CRO.  The Debtors were required to engage the CRO that Conterra approved.  The CRO was granted total control of the Debtors' operations.  The June 27 Letter Agreement restricted the Debtors' operations, including by requiring the CRO's approval of

14

any vendor payment. The CRO then, in effect, reported and answered directly to Conterra and no one else.

74. In the June 27 Letter Agreement, the Debtors were prohibited from making payments to any vendor, officer, employee, lender, or other party without the CRO's prior approval of such payment.

75. The June 27 Letter Agreement also prohibited the Debtors from entering into any transaction outside the ordinary course of business without the CRO's prior approval of such transaction along with advance notice to Conterra.

76. The Debtors were required to operate in accordance with a budget. While the June 27 Letter Agreement provided that revisions to the budget could be negotiated from time-to-time between the CRO and Conterra to account for variances and unanticipated changes, Conterra was not required to agree to any changes to the budget and Conterra reserved the right to reject any proposed modification at its sole discretion. As a result, Conterra had ultimate and final control over the budget, including the scope of the payments to the Debtors' creditors thereunder.

77. Crucially, upon information and belief, Conterra exercised control through determining which particular creditors could be paid on a week-to-week basis. Upon information and belief, each week, Conterra was provided a list of the checks or disbursements the Debtors proposed to pay, including on account of trade vendor debt, and Conterra would then decide whether or not the Debtors were authorized to make such payments. Thus, Conterra determined which vendors of the Debtors would be paid and how much, if at all.

78. While the June 27 Letter Agreement states that Conterra shall not have any authority to control or direct the CRO, upon information and belief, Conterra did, in practice, exercise such control and direction. Indeed, the very inclusion of this disclaimer in the June 27 Letter Agreement underscores Conterra's recognition that the rights and restrictions set forth in the agreement effectively conferred upon Conterra the ability to control and direct the CRO and, through the CRO, the Debtors' operations.

15

79. In sum, Conterra exercised control of the Debtors through the budgetary, payment, and other operational restrictions in the June 27 Letter Agreement and through the Conterra-approved CRO required by that agreement, who then reported to Conterra.

80. In addition, through its specific control over which vendors would be paid on a weekly basis, Conterra was able to utilize the Debtors' vendors to increase its own recovery while paying such vendors as little as possible.

81. The Debtors' general unsecured creditors include logistics companies (the "**Logistics Companies**"), producers/farmers of grapes (the "**Producers**"), and creditors who provided chemicals and other products to the Debtors to maintain and protect the Debtors' crops (the "**Product Providers**"), each of whom served a vital role in the Debtors' operations.

82. The Logistic Companies carry the Debtors' packaged table grapes to major retailers, such as Walmart, Costco, and Del Monte, to be sold, creating revenues for the Debtors.

83. The Logistics Companies generally provided services from July through the end of the calendar year.

84. The payments made to the Logistic Companies on a weekly basis were less than such Logistics Companies were incurring on a weekly basis to ship product to retailers. Moreover, as the calendar year progressed, the amount of the Conterra-approved payments to the Logistic Companies became less and less, causing the balances owed to the Logistic Companies to increase. Then, once the Logistics Companies' services were completed, payments on account of their debts ceased.

85. Producers sold their own respective crops to the Debtors. The grapes were typically sold by the Producers to the Debtors in or around August of each calendar year and paid in or about March of the following year. The purchased grapes were then pooled by the Debtors with the Debtors' own grapes for eventual sale to third parties. As such, amounts paid to Conterra prepetition and/or to be paid to Conterra postpetition, such as, through the Prepetition Cash Collateral, include proceeds from the Producers' crops and for which the Producers were not paid.

86. The Product Providers provided chemicals and other products to the Debtors throughout the year for the growth and care of the Debtors' crops. Minimal payments were made on the debts of the Product Providers.

87. Conterra had access to any and all information it desired regarding the Debtors' operations. Conterra was to be provided weekly reporting and monthly certifications as required under the June 27 Letter Agreement. Conterra was receiving weekly the Debtors' proposed disbursements to creditors. Therefore, Conterra knew, or should have known, that the payments to the Debtors' trade vendors were not sufficient to fully pay for the actual amounts owed to them and that such trade vendor's debt balances were growing. Moreover, upon information and belief, Conterra made the decision to withhold or cease payments to Logistics Companies, Producers, and/or Product Providers once their respective services and products were obtained and no further services or product were needed.

88. As the 2025 harvest season progressed, certain vendors of the Debtors were informed that payments to them were reduced or discontinued in their entirety at the direction and say of Conterra.

89. After the Debtors' harvest was completed, in or about November 14, 2025, Conterra terminated the Debtors' access to the bank account subject to a deposit control agreement and began sweeping such bank account on a daily basis.

90. By virtue of the requirement in the June 27 Letter Agreement that the CRO "disclose and discuss" with Conterra all matters that it required, Conterra had access to such information to be a *de facto* insider of the Debtors.

91. Upon information and belief, and as reflected by the commencement of the Cases themselves, the Debtors were inadequately funded and under capitalized during 2025 and in 2026 prior to the Petition Date.

G. **Conterra Receives About $14 Million and Recorded UCC-1 Within the Preference Period**

92. While Conterra was limiting the amounts paid to trade creditors for their services (or preventing such payment all together), Conterra received approximately $14

17

million from the Debtors within the 90 days before the Petition Date (such 90-day period, the "**Preference Period**"). Moreover, Conterra's daily cash sweeps from the Debtors' account rendered the Debtors entirely dependent on loans from Conterra for operations.

93. A UCC-1 Financing Statement, bearing file number U260009245018, was filed on February 6, 2026 with California's Office of the Secretary of State, identifying Conterra as the secured party (the "**February 6 UCC-1**"). The description of the collateral on the February 6 UCC-1 states: "All assets of Debtor." The "debtors" identified on the February 6 UCC-1 are Hronis Fruit and HRM.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Equitable Subordination of Conterra's Claims**
**Pursuant to 11 U.S.C. § 510(c)**

94. The Committee repeats, realleges, and incorporates by reference each and every allegation contained in paragraphs 1 through 93 above as if fully set forth herein.

95. Pursuant to section 510(c) of the Bankruptcy Code, this Court is authorized under principals of equitable subordination to subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim.

96. As detailed above, Conterra exercised control of the Debtors and their operations through the restrictions in the June 27 Letter Agreement and, by, among other things, requiring the Debtors to hire a CRO approved by Conterra and who then reported and answered to Conterra, and determining which creditors of the Debtors would be paid and the amount of any payments on a week-to-week basis.

97. Conterra did not merely monitor the Debtors' operations or proffer advice; Conterra exercised control of the Debtors and the Debtors' operations and specifically determined whom the Debtors could pay. Conterra effectively had veto rights over which trade creditors the Debtors could pay and Conterra wielded such rights to enhance its own recovery to the detriment of the Debtors' trade creditors.

98. By sweeping the Debtors' cash, Conterra (1) deprived the Debtors of cash that could otherwise have been utilized to pay the Debtors' trade creditors and (2) made the

Debtors entirely dependent on financing for operations and, thereby, further reinforced its control of the Debtors.

99. Conterra's inequitable conduct directly harmed the Debtors' trade creditors, leaving them with large unpaid debts, all while enhancing Conterra's overall recovery. Conterra's inequitable conduct allowed it to reap the value of the Debtors' operations and property at the expense of the very parties who were instrumental in creating that value. Conterra utilized its control of the Debtors to string the trade creditors along, inducing or allowing them to provide services, farm products for sale, and products to care for the Debtors' crops while Debtors' debts to such trade creditors increased. Conterra's inequitable conduct shifted the risk of non-payment to the Debtors' trade creditors.

100. Equitable subordination of Conterra's claims to the claims of the general unsecured creditors, except those of the equity interest holders, is consistent with the provisions of the Bankruptcy Code.

101. For the reasons above, Conterra's claims against the Debtors should be subordinated to the claims of the general unsecured creditors pursuant to section 510(c) of the Bankruptcy Code to the extent needed to redress the harm caused to the general unsecured creditors by Conterra's inequitable conduct and control in an amount according to proof at trial and any liens securing Conterra's subordinated claims should be transferred to the Estates.

**SECOND CLAIM FOR RELIEF**
**Declaratory Judgment – No Security Interest in or**
**Lien on Personal Property of Hronis Ranch and HRM**
**Pursuant to 28 U.S.C. §§ 2201, 2202 and 11 U.S.C. §§ 544, 550, and 551**

102. The Committee repeats, realleges, and incorporates by reference each and every allegation contained in paragraphs 1 through 101 above as if fully set forth herein.

103. To the extent Conterra asserts purported security interests in or liens on the personal property of Hronis Ranch or HRM (including, but not limited to, farm products or crops grown of either Hronis Ranch or HRM) or the proceeds thereof, such security interests and liens are not valid or enforceable.

104.     Additionally, the Prepetition Cash Collateral that the Debtors are required to pay to Conterra under the Final DIP Order that are proceeds of the farm products or crops grown of Hronis Ranch or HRM are not subject to a valid and enforceable lien of Conterra. Thus, such Prepetition Cash Collateral should not be paid to Conterra and, if and to the extent that such Prepetition Cash Collateral has been paid to Conterra, then it is subject to claw back under the Final DIP Order.

105.     Neither Hronis Ranch nor HRM is a "Borrower" for purposes of Article 5 (titled "**Security**") of the LSA.  More specifically, Hronis Ranch and HRM are not a "Borrower" that "grants to the Lender [*i.e.*, Conterra] a continuing security interest" as set forth in Section 5.1 of the LSA.

106.     Any purported security interests or liens asserted by Conterra in the personal property of Hronis Ranch and HRM as of the Petition Date is improper, unenforceable, and incapable of being perfected.  Any security interests and liens purportedly attaching to the personally property, including, without limitation, the farm products or crops grown, of Hronis Ranch or HRM and the proceeds thereof are subject to avoidance under section 544(a) of the Bankruptcy Code, the property transferred or the value of such property is recoverable by the Estates pursuant to section 550(a) of the Bankruptcy Code, or the transfer(s) avoided are preserved for the benefit of the Estates pursuant to section 551 of the Bankruptcy Code.

107.     An actual, justiciable controversy exists between the Committee and Conterra concerning the extent of Conterra's asserted security interests in or liens on the personal property of Hronis Ranch and HRM and the extent to which farm products and crops grown are personal property of either Hronis Ranch or HRM.

108.     Such a declaration is necessary, appropriate and in the interests of judicial efficiency and economy by resolving the controversy between the parties.

### THIRD CLAIM FOR RELIEF
#### Avoidance of Preferential Transfer
#### Pursuant to 11 U.S.C. §§ 547, 550, and 551

109.     The Committee repeats, realleges, and incorporates by reference each and every allegation contained in paragraphs 1 through 108 above as if fully set forth herein.

110. On February 6, 2026, Conterra recorded the February 6 UCC-1, which identified Hronis Fruit and HRM as debtors.

111. Upon information and belief, the February 6 UCC-1 was recorded by or on behalf of Conterra to add two debtors (Hronis Fruit and HRM) not included in the prior-recorded Conterra UCC-1.

112. The February 6 UCC-1 is a transfer that is avoidable under section 547(b) of the Bankruptcy Code.

113. Section 547(b) of the Bankruptcy Code allows a debtor to avoid any transfer of an interest of the debtor in property if: (i) the transfer was made to or for the benefit of a creditor; (ii) the transfer was for or on account of an antecedent debt; (iii) the transfer was made while the debtor was insolvent; (iv) the transfer was made on or within the 90 days before the filing of the bankruptcy petition; and (v) the transfer enabled the creditor to receive more than the creditor would have received in a hypothetical chapter 7 liquidation.

114. The February 6 UCC-1 was recorded with California's Office of the Secretary of State for the purpose of benefiting Conterra as the secured party, and in fact, Conterra is specifically listed as the secured party on the February 6 UCC-1.

115. The February 6 UCC-1 was recorded on account of the antecedent obligations owing to Conterra under the LSA and Conterra Promissory Note dated October 29, 2024.

116. Section 547(f) of the Bankruptcy Code provides that "the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition." Accordingly, the February 6 UCC-1 was recorded at a time when the Debtors were insolvent.

117. Because the February 6 UCC-1 was recorded on February 6, 2026, such recordation was made within the Preference Period.

118. By recording the February 6 UCC-1, Conterra perfected its security interests in the Debtors' property and reduced the amount by which the indebtedness owed to Conterra was unsecured or undersecured. This allowed Conterra to receive more than it would in a hypothetical chapter 7 liquidation had the February 6 UCC-1 not been recorded.

21

119.    Based on the foregoing, the Committee is entitled to avoid the February 6 UCC-1 pursuant to section 547 of the Bankruptcy Code, and to recover the property transferred or the value of such property pursuant to section 550(a) of the Bankruptcy Code, and to preserve for the benefit of the Estates the transfer avoided pursuant to section 551 of the Bankruptcy Code.

**FOURTH CLAIM FOR RELIEF**
**Declaratory Judgment – Denial of Credit Bid Pending Challenge**
**Pursuant to 28 U.S.C. §§ 2201, 2202**

120.    The Committee repeats, realleges, and incorporates by reference each and every allegation contained in paragraphs 1 through 119 above as if fully set forth herein.

121.    The Debtors have proposed a sale of substantially all assets to Conterra on account of a credit bid in the form of a stalking horse bid.

122.    Section 363(k) of the Bankruptcy Code provides that a party holding an allowed secured claim may credit bid such claim at a sale of the assets serving as the collateral for the secured claim, unless the court for cause orders otherwise.

123.    Conterra does not have an absolute right to credit bid.  *See In re Figueroa Mountain Brewing LLC*, No. 2021 WL 2787880, at *5 (Bankr. C.D. Cal. 2021).

124.    Cause exists to deny or limit Conterra's right to credit bid.

125.    First, due to the objection to Conterra's claim set forth herein, Conterra does not hold an allowed secured claim.

126.    Second, as demonstrated herein, bona fide disputes exist as to Conterra's claim and liens.  The Committee seeks to equitably subordinate Conterra's claim, to avoid liens asserted by liens, and a judgment that Conterra does not hold liens as to certain assets.

127.    Third, the Court "may deny a lender the right to credit bid in the interest of any policy advanced by the Code, such as to ensure the success of the reorganization or to foster a competitive bidding environment."  *See In re Figueroa Mountain Brewing*, 2021 WL 2787880, at *6.  The same inequitable conduct alleged above that justifies the equitable subordination of Conterra's claim supports denying Conterra's right to credit id.  Moreover, the proposed credit bid is inconsistent with the purposes of the Bankruptcy Code as it permits Conterra to utilize

22

the bankruptcy process to effectuate a *de facto* foreclosure with no benefit for the general unsecured creditors. Permitting Conterra to submit a credit bid where the amount of its secured claim and the extent of its liens are in dispute could chill bidding, compromise the sale process to the detriment of the Estates, and could lead to an inappropriate windfall for Conterra.

128. Based on the foregoing, the Committee is entitled to a judgment that denies or limits Conterra's right to credit bid.

**FIFTH CLAIM FOR RELIEF**
**Declaratory Judgment – No Security Interest in or**
**Lien on Commercial Tort Claims**
**Pursuant to 28 U.S.C. §§ 2201, 2202**

129. The Committee repeats, realleges, and incorporates by reference each and every allegation contained in paragraphs 1 through 128 above as if fully set forth herein.

130. Upon information and belief, the Estates possess causes of action for, among other claims, breaches of fiduciary duty and other torts. Certain of the causes of action held by the Estates are commercial tort claims ("**Commercial Tort Claims**") under the Uniform Commercial Code.

131. Section 5.1 of the LSA purports to grant Conterra security interests in and liens on Commercial Tort Claims.

132. However, Conterra does not have an enforceable and perfected security interest in or lien on Commercial Tort Claims because the LSA does not specifically identify or otherwise describe such claims as is required under section 9108(e)(1) of the California Commercial Code.

133. Moreover, Conterra does not have an enforceable and perfected security interest in or lien on Commercial Tort Claims of Hronis Ranch or HRM because neither Hronis Ranch nor HRM granted any such security interest in or lien on Commercial Tort Claims.

134. An actual, justiciable controversy exists between the Committee and Conterra concerning the extent of Conterra's security interest in Commercial Tort Claims, if any, possessed by the Estates.

23

135. Such a declaration is necessary, appropriate and in the interests of judicial efficiency and economy by resolving the controversy between the parties.

**SIXTH CLAIM FOR RELIEF**
**Declaratory Judgment – Adjustment for the Equities of the Case**
**Pursuant to 11 U.S.C. § 552(b) and 28 U.S.C. §§ 2201, 2202**

136. The Committee repeats, realleges, and incorporates by reference each and every allegation contained in paragraphs 1 through 135 above as if fully set forth herein.

137. Under section 552(b) of the Bankruptcy Code, if and to the extent that Conterra holds a security interest that extends to proceeds, products, offspring, or profits of property of the Debtors acquired after the Petition Date (collectively, "**Postpetition Proceeds**"), the Court can, based on the equities of the case, equitably allocate such Postpetition Proceeds amongst Conterra and the general unsecured creditors. Here, the equities of the case warrant such allocation.

138. As detailed above, Conterra engaged in inequitable conduct to the detriment of the general unsecured creditors. Conterra exercised control of the Debtors and their operations through the restrictions in the June 27 Letter Agreement and, by, among other things, requiring the Debtors to hire a CRO approved by Conterra and who then reported and answered to Conterra, and determining which creditors of the Debtors would be paid and the amount of any payments on a week-to-week basis.

139. Conterra's inequitable conduct enhanced the value of Conterra's purported collateral and improved Conterra's recovery on its claims against the Debtors at the expense of the trade creditors whose services—such as providing the product needed to grow the farm products, providing the farm products being sold, and transporting the farm products to the customers for sale—were essential components in generating value.

140. Allocating Postpetition Proceeds, including, without limitation, the Prepetition Cash Collateral or value received in connection with or on account of any sale that is attributable to Postpetition Proceeds, to provide for a meaningful recovery for the general unsecured creditors, notwithstanding any purported security interests asserted by Conterra, is consistent with section 552(b) of the Bankruptcy Code because it would prevent Conterra

24

from unfairly receiving a windfall and reaping the value created by the Debtors' general unsecured creditors without paying the debts incurred in creating such value.

### SEVENTH CLAIM FOR RELIEF
### Disallowance of Claim
### Pursuant to 11 U.S.C. § 502(d)

141. The Committee repeats, realleges, and incorporates by reference each and every allegation contained in paragraphs 1 through 140 above as if fully set forth herein.

142. Conterra is a transferee of transfers avoidable under section 547 of the Bankruptcy Code, which property is recoverable under section 550 of the Bankruptcy Code.

143. Conterra has not turned over, or paid the amount of, the avoidable transfers for which Conterra is liable under section 550 of the Bankruptcy Code.

144. Pursuant to section 502(d) of the Bankruptcy Code, any and all claims of Conterra against the Debtors must be disallowed until such time as Conterra turns over or pays to the Debtors an amount equal to the aggregate amount of the avoidable transfer(s).

### PRAYER FOR RELIEF

**WHEREFORE**, by reason of the foregoing, the Committee requests that this Court enter an order:

(a) Equitably subordinating Conterra's claims in an amount to be proven at trial to the claims of the general unsecured creditors, except for equity interest holders, and transferring to the Estates any liens securing such claims pursuant to section 510(c) of the Bankruptcy Code;

(b) Declaring that Conterra's security interests in or liens on the personal property of Hronis Ranch or HRM (including, but not limited to, farm products or crops grown by either Hronis Ranch or HRM) and the proceeds thereof are not valid or enforceable, or in the alternative, avoiding Conterra's security interests in or liens on the personal property of Hronis Ranch or HRM (including, but not limited to, farm products or crops grown by either Hronis Ranch or HRM) and the proceeds thereof pursuant to section 544(a) of the Bankruptcy Code,

25

recovering for the benefit of the Estates the property transferred or the value thereof pursuant to section 550(a) of the Bankruptcy Code, and preserving the avoided security interests in or liens on the personal property of Hronis Ranch or HRM for the benefit of the Estates pursuant to section 551 of the Bankruptcy Code;

(c) Avoiding Conterra's February 6 UCC-1 pursuant to section 547 of the Bankruptcy Code, recovering for the benefit of the Estates the property transferred or the value thereof pursuant to section 550(a) of the Bankruptcy Code, and preserving the avoided security interests or liens for the benefit of the Estates pursuant to section 551 of the Bankruptcy Code;

(d) Declaring that Conterra's right to credit bid its purported allowed claim is denied or limited for cause pursuant to section 363(k) of the Bankruptcy Code;

(e) Declaring that Commercial Tort Claims are not subject to any enforceable and perfected security interests or liens of Conterra;

(f) Declaring that Postpetition Proceeds in an amount subject to proof at trial are available for the general unsecured creditors and are not subject to security interests or liens of Conterra pursuant to section 552 of the Bankruptcy Code; and

(g) Disallowing Conterra's claims against the Debtors pursuant to section 502(d) of the Bankruptcy Code.

Respectfully submitted,

Dated: May 18, 2026          **RAINES FELDMAN LITTRELL LLP**

By:    */s/ Robert S. Marticello*
            Robert S. Marticello (SBN 244256)
            Mark S. Melickian (*Admitted Pro Hac Vice*)

*[Proposed] Counsel for the Official Committee of Unsecured Creditors*

26